I am Lloyd Smith III and I have the privilege of representing the Blackburns who are residents  and we contend that we have filed a proper claim for a physical regulatory taking of Blackburn's property located in Dare County because of the law that Dare County passed on March the 20th, 2020, which prohibited any access into the county by non-resident property owners. Can I stop you for a second just because you said something that I had a question about You said that it was a regulation that was passed on March the 20th. When I look at the three different ordinances, they don't have an actual passed on date, but the record seems to suggest that they were all actually passed on the 16th at the same time. The first which was just mass gatherings and it was effective as of that day and there was a second that was non-resident visitors and that was effective even though passed the same on the 16th was effective one day later and then also the third which as you mentioned was effective, not passed, but effective on March the 20th. Am I right? You said the March 20th orders, but didn't they all enact on the 16th and take effect on different dates? Yes, sir. I think you're absolutely correct. I misspoke. Okay. And then we ought to think about those as sort of like a single action. The reason they did them as separate ideas was to give a different lag time for the three different actions they wanted to take, right? They wanted to stop mass gatherings today. They wanted to say visitors as of tomorrow, you can't come and then non-resident property owners, we're going to give you four days, but then we're going to stop that too. I'm just trying to understand what's happened. Sequentially, yes, sir. I think that's absolutely correct. And so if I understood your opening statement correctly, you're claiming a physical regulatory taking as opposed to a physical taking in the sense of condemnation to put a road through the property? Yes, sir. Okay. And the reason we're taking that position, if it pleases the court, is that our clients were ousted from their property as were most of the non-resident property owners in that county. It is a common idea in the law that is often referred to as a bundle of sticks or a bundle of rights in the property when you determine what someone has lost because of regulatory taking, and in North Carolina at least, those rights include the right of the owner of the land to access and to possess, the right to use, the right to enjoy, the right to dispose of it, and the right of control and correspondingly the right to exclude. And we contend that in this particular case that Dare County took a significant bundle of sticks away from the non-resident property owners that did not live in the three adjoining counties. Can I ask about the bundle of sticks that's been taken away? Yes, sir. If I, as I read the order, it says that non-resident property owners may not enter Dare County, but if on March the 19th I was a property owner and I showed up to my house and I moved in on the 19th, is there any suggestion that this ordinance would have kicked me out on March the 21st? Yes, sir. It's my understanding you had to leave. And so what is that? I agree that you make the argument in your brief. I don't understand why that, I don't see where I get that conclusion. That's the argument that you make, but the ordinance obviously does not say that. It says you may not enter Dare County, right, which doesn't mean you must leave Dare County. Those are different phrases. And I don't see anything in any of the regulations or the record other than your brief that suggests that you had to leave on March the 21st if you were already present. What can you point me to that would suggest that I should read the ordinance's use of the term enter to mean something other than enter? Your Honor, I cannot point to anything in the ordinance itself. I can point to your practical experience being in that part of the world. I'd prefer something in the record. This isn't a knock on you at all. It's a limitation on the ability to decide a case based on a record, not based on your representations. I certainly trust you, but that doesn't help me any, right? No, sir, it does not. But the non-residents, as I understand the ordinance, when it said could not enter Dare County, that meant they had to leave once they were there, too. Well, that was our interpretation. If we assume that the record doesn't show that, in Judge Richardson's example, the Blackburns next door neighbors there came from Richmond the weekend before, and they came with the whole family, so they had a house full, and they didn't have to leave, was there any prohibition on the Blackburns allowing the neighbor's grandchildren to live in their house during this period of time? No, sir. Because they were already there? Under that hypothetical, no, sir, I do not believe there was. So they did have some use of it. Could have had some use. Somebody else would have had use of it. They would not have had use because they were absent. But they could have rented it to the next-door neighbors for that period if they wanted to. That's assuming that next-door neighbors needed a place to rent, but yes, sir, that's a hypothetical. As Mayor, there's no question concerning that. However, the vast majority of people in March of 2020, just geographically because of weather, are not in Dare County, they're non-resident property owners. They are secondary homes as a general rule. And that is where we get into the bundle of sticks. Judge Richardson, I hope I answered your question. I wasn't trying to mislead you at all. No, no, I took you, in fact, you were quite helpful. You answered exactly what I thought the answer was, but I just was trying to make sure I understood. Yes, sir. So out of the bundle, other than not being able for this period of time to access the house themselves, what other indicia of ownership were they missing? The right of possession, which is a separate one. The right to control, I suppose under your example, they could have controlled it remotely by phone, but I don't think that that is what the Supreme Court of the United States has considered to be control. The right of enjoyment, they certainly could not go upon the property. Why is it that they lost the right of possession? So I get enjoyment, right? That's the best of them, right? But they still possess, possession doesn't just mean holding it, right? And so, you know, I still possess land even if I'm not sitting on it at the very moment from a property perspective, right? So they possess the property. Well, they own the property. Possession I believe is defined by the Supreme Court as actually being able to go upon it, the right of access and possession meaning synonymously that one goes upon one's property. Here, the, Dare County in effect built a fence all the way around the Blackburns' property on all sides and they couldn't get to it. Now, they might have been trapped in it if, as you said earlier, you didn't have to leave, but for the majority of the non-resident property owners, they were completely blocked off from their property. They could not do anything. They could sell it, but even the right to exclude, which the Supreme Court said is perhaps the most important right, we contend that if you're not there, how do you know when you can exclude? Who do you exclude? How do you exclude? Isn't that a factual question as opposed to a legal question? How is their legal authority to exclude affected? Their legal authority to exclude is affected because they don't know how and when to exclude nor do they have any ability to do so. They could certainly authorize agents to act for them to exercise their power of exclusion. I'm trying to distinguish between the question of whether or not there's a trespasser and the owner's right to exclude because anyone who owns property has the right to exclude, but the fact that there may be a trespasser at some point doesn't affect their legal right to exclude. No, sir, but you've got to be able to exercise the right to exclude like Justice Roberts held in the Cedar Point Nursery case. That is an important right. How does one exercise that right if one is not there to do it? Well, that's the factual question that I think Judge Agee is pointing to. Some people do exercise their right to exclude by hiring a local property manager who goes and checks on the property and makes sure everything is, you know, they're excluding people. They have a ring doorbell camera. Those are factual questions, but the legal question is the legal right to exclude and not how it was exercised. Well, perhaps I'm misunderstanding, Judge, and I understand it is a legal point, but how does the Blackburns know to exclude? How do they have that ability? That may be a factual question, but it seems like to me it's a legal question. If the right to exclude is predominantly the right to own property in this country, you can't exercise it if you're not there. Excuse me. And since I'm running very short on time, I do want to say that we think that if there was not a physical taking, that there was a claim for regulatory taking under the Penn Central case and the Lingle case. Judge Flanagan found for us on the first two issues as to the third issue, the condition of the government action, we take the position that the government action Well, we're going to give you a little extra time, Counselor, because this is an important case and I wanted to ask you on the first issue, which I think that's economic impact. The district court said that there was an allegation in the complaint of economic loss. Can you point us to the best example of that in the complaint where you're claiming economic loss? I can't in just a minute, I'm sorry. You might start with paragraph 19. Yes, sir. My book broke open, Your Honor, I apologize. Looking on 19, we've alleged they've suffered damage as they have lost the fair market rental value and the value of the loss of use of city property by government regulations for 45 days. Let's start with the scope. Is there anything else other than that? I do not know of anything else, Your Honor. The principles of notice pleadings, obviously we could have filed a 500 page complaint that would have said how much per day, but I don't think under notice pleadings for purposes of Rule 12B6 motion, one has to do anything other than make a statement which is in good faith made that they have lost the temporary complete taking of the property by the loss of the fair market value of the property and the value of its use. You've alleged the loss of the fair market rental value and that seems to be questionable because I'm not understanding there being any prohibition on renting to other residents of the county who were lawfully there, residents of the adjoining counties who could lawfully enter, workers who were authorized to enter. It seems like there was a market pool, maybe not as large as a full market pool, but I'm not sure that it's accurate in the complaint to say there was a loss of fair market value, a fair rental value. Your Honor, I would have to go outside of the record to talk about the number of rental properties that there are owned by non-resident property owners. Now we're back to a factual question. Legally, this property, being where it is, is identified, I think the court can take notice of where Frisco, North Carolina is, and this property did in fact had to have lost rental value. There are no non-residents allowed into the county. But there is, I think you'd have to concede, under the ordinances adopted there were still categories of persons who could have rented the property had the Blackburns sought to do that. To the limited extent that there was someone in one of the three adjoining counties that was a property owner or a resident that wanted to come to the county, yes, I would certainly concede that point. So if that takes that out, then we're left with whatever economic value of the use was as the basis for that first Penn Central factor. Yes, sir, and of course, if that has value because cottages have rental value, if the Blackburns couldn't use their own cottage, they'd have to go rent another one, so they've got a different law, it seems to me. All right, why don't you take about one more minute to say something about the other Penn Central factor? Yes, well, the judge found with us on the second one as to the third one, we think it's extremely important that the court take notice of the fact that there were actually three groups of property owners that were established under this ordinance, or non-resident property owners in the three adjoining counties, resident property owners within the county, and then everybody else in the United States. And as I understand the precepts of LINGO, and what Justice Brennan also said in Penn Central, the owners are to be treated, the property is to be treated the same, and it was not. People that were non-residents and owners from... Is that a takings clause argument, or is that a privileges and immunities argument? I don't know that the takings clause establishes a principle of equal treatment of residents and non-residents, right, but it establishes payment for taking of anyone's property. But when you're talking about distinguishing between these different groups of people, that sounds to me like you're getting into a different constitutional provision. Yeah, and I certainly hope not, because in both of those cases that I cited, they said that was something one considered when considering the nature or character of the governmental action. Who bears the burden of that? Yes, who bears the burden? Is it an economic burden that's borne by all, or is somebody specifically singled out? In this case, the non-resident property owners, and who did not happen to be from Currituck, Hyde, or Terrell, as well as the residents of Dare, they suffered no burden whatsoever, whereas everyone else... Why do we say that? Why do you think that they suffered no burden? So imagine I live in Dare County, and I run the grocery store. These three regulations just ban all of the visitors that come into the county. I'm the food line right there just north of town, and now no non-residents can come in. That seems like part of this ban burdened them a great deal. All the residents that lived there that worked in those counties, there was a huge burden on them. I think it's sort of undeniable when you shut down tourism in that part of the country, it has a huge impact on those people. But the impact is because it's a travel ban, not because it's a property taking. Maybe that's an Article IV privileges and immunities case, but we don't have that one before us right now. I don't think it is a property ban, I mean a travel ban. If it was a travel ban, why would they have passed the third one that added non-resident property owners? If you're just going to keep people out, just say everybody stays out. That's a travel ban. But they can't say everybody stays out, or they didn't choose to, because they wanted to let the other county folks come in, the surrounding counties, and wanted to let workers come in. They wanted to let residents come in, whether they owned property or not, it didn't matter. So you could rent there, you could be a non-owner, but as long as you're a resident, you can still come in. So they couldn't ban everybody because they made a decision, and we're not judging the decision, but they made the decision that we want a travel ban. But we're going to make some exceptions to it, and that's what they did. I would suggest that whatever their intent, the effect was that they actually barred people from their property and took their use away from them, which is a compensable taking, and I don't intend to be at all picky about this, and I hope we're just having an exchange here, but as you pointed out to me, what's a matter of law, what's a matter of fact, I don't know the facts as to what the effect of those people being kept away from stores in their county is. That's not a matter of law. What is a matter of law is that they treated different property owners differently. You're having to assume. Well, they treated residents different from non-residents, but you agree, you can be a resident without being a property owner. You can. So they treated residents different from non-residents, which is a slightly different question than treating property owners differently. But they also treated the people that were in the other three counties differently. If it was a travel ban, why do they treat those three people any differently? What's unique about Currituck, Hyatt, or Terrell? And I'd say there's nothing unique about it. Thank you very much. We've got some rebuttal time. Mr. Castro, let's hear it from the government. Thank you, Your Honor. My name is Brian Castro. I represent the Appalachian-Bear County, along with my co-counsel here, Chris Geis. This case involves a temporary 45-day travel restriction that was enacted in the beginning of the COVID pandemic in March, around March 16th, March 20th of 2020. Let's make it clear that there was no ouster. There's nothing on the record, nor anything in the orders, about anyone being excluded from their homes. Non-resident property owners were given a short period of time to enter the county into their secondary homes, into their vacation homes. So I get that that seems like the natural implication. Let me back up one second. They were all adopted on the 16th? They were adopted on the 16th. Right. And then the mass gathering was effective that day, the visitors the next day, and then four days for non-resident property owners. And you made the jump that I think naturally comes, but is there anything in the record that suggests that that's why they left four days, was to sort of give people the chance, if you want to come, you got to come now, because then we're going to shut the door. There's nothing in the record suggesting that that was the purpose behind that staggering, but it was staggered for the purpose of not imposing these restrictions all at once, giving the people the opportunity through that staggered system to prepare for what was to come next. The logical first step was to prevent those mass gatherings. After that, staggering towards the non-resident property owners. The appellants have admitted in their complaint that the county was responding to a public health crisis, to an emergency. They admitted that the county had the authority to issue this order. The only question now is whether there was a taking, whether there due compensation. And as has been noted here, they have not alleged any substantial diminution in property value whatsoever. What is required under Penn Central, which is an exception to the rule that usually a taking must be physical in nature, there must be a substantial diminution in property value to even come close to becoming a regulatory taking. Courts have only accepted usually a 90% or more diminution in property value. If you look at the concrete pipe and products case from the Supreme Court in 1993, and the Penn Central case at 438 U.S. at 131, it cites cases where 87.5% diminution was insufficient. We are here on a motion to dismiss, right? We haven't had the expert evaluations and fact findings that presumably it would take to reach that sort of conclusion yet about exactly what the value was that was lost by not being able to rent to non-residents for 45 days. Correct. However, even at the 12B6 stage, it was the appellant's burden to plausibly allege some sort of taking, plausibly allege that there was a sufficient diminution in value. And the only thing that has been alleged or could be alleged is a mere 45-day loss in use and 45-day prohibition on renting to non-residents. As was noted, the contiguous counties which are surrounding Dare County were allowed to enter and leave the county because there are more facilities within Dare County. Also, they were able to rent, have contractors on their property. They were able to rent out to people that are in Dare County who would like to have some beachfront properties. This is not a complete taking. This was not a complete diminution in property value. Is the limitation on the rental pool, the reducing the rental pool by some factor, is that a cognizable economic loss under the first Penn Central factor? It would be the type of, the first Penn Central factor looks at the totality of the economic loss in comparison with the property. It appears to me that that would be more of a business-related income, a revenue stream that would be lost. The Penn Central factor really looks at the diminution in property value, it appears, if it is deprived of all economically viable use during that time period. That minimal... During the time period seems like the hard part to me. Imagine it's a hotel. I know there are no hotels in Dare County, at least that I'm aware of, but imagine there's a hotel. Their whole business is set up to rent rooms, and yet, on the one hand, they've been deprived of all of their business revenue, just hypothetically, for that time period. But on the flip side, it's only 45 days, and so the value of the business enterprise, the hotel itself, probably hasn't decreased all that much in just those 45 days' worth of lost revenue. There's some reduction, but it's not too substantial. You can still sell the hotel for some value, more than 10% of the value that existed before. How do we think about what the right context is? In the hotel example, hypothetically, it's a complete loss during those 45 days, but it has a 10% reduction on the value of the hotel as an entity. What do we do with that in Penn Central? In Penn Central, the courts have made it clear that, according to your hypothetical, the limitation on the time period is very important in making that distinction and making that analysis on the economic impact. The court in Tahoe, Sierra, the Supreme Court, stated that it is improper to desegregate that property into that 45-day period, let's say the hotel, desegregate that hotel into those 45 days and say they were not valuable for 45 days, and then declare that there was a taking. In Tahoe, Sierra, there was a 32-month moratorium on the development of property. That was not a taking. The court stated that the proper analysis, when we have a temporary restriction, is to analyze the property's value before the restriction is enacted, compare it to that after the restriction is lifted. If this was an indefinite prohibition on the use of property or something more substantial and more than a 10% reduction, you start getting more into the 80% range, then we can start thinking about whether Penn Central would allow this to be considered a regulatory taking. To go back to Judge Rushing's question, I'm given hypotheticals, so it's a little hard, but the challenge is, how do I know that it's not a very big reduction on this record? Maybe there's a sense in which we all have a feeling that 45 days isn't that much, but at 12B6, can we reach that conclusion on this factual question? You could reach this conclusion, I believe, based on the allegations in the complaint. The allegations themselves admit that this was temporary in nature. It was lifted after 45 days, and during that 45 days, again, it's their burden to allege a plausible taking. It could not be plausible that a 45-day restriction on entry into land could diminish the value to a great extent. There could not be plausible allegations of that. If this was longer in nature, if this restriction was six months or a year, or indefinite to the point where the property would be valueless at the end of this restriction, then we would have a different analysis, but on the pleadings themselves, it appears to be implausible and also not adequately alleged that there was a substantial diminution in value. Don't we have to look at the time? It was indefinite at the time it was instituted. The March 16th orders didn't say for 30 days, I don't believe, at least that's my recollection of reading them, they were indefinite. We now know in hindsight it was 45 days, but on day 30, the Blackburns could look at their property and be like, we can't sell it for the value that we could before because whoever we sell it to can't visit, they can't rent it, or they can only rent it to a really small group of people. Right, at that point, we would be looking more towards an injunctive relief type analysis and seeing, analyzing whether this would be indefinite, however, at this stage... No, but the point is, is the value that they could sell it once the, it seems like to me, once the regulation was instituted, right? So on March the 21st, when there's an indefinite ban on travel, what could they have sold their property for? And, I mean, it's an indefinite time period, I don't know the answer to that, I could speculate like you could, but based on this record, how do we know whether there was a substantial reduction because people were concerned about, you know, long travel bans or the like? Well, you can see that from the record and the amount of use that was still allowed with the property. They were still allowed to have people, persons within the county to use that property. They were still allowed to, those in contiguous counties were allowed to use the property. They were allowed to rent the property to those within the county and those three contiguous counties. They were able to have contractors and other viable uses of that property. So there was value in that property and also the right to possession does not only include the right to actually sit on that property. It includes the possession right in that fee simple estate, which was valuable at the time that the restrictions were imposed. We would like the court to see this in the context of what the county was reacting to, which was an emergency situation. We're talking here about Dare County, they're on the outer banks. If you look at a natural disaster, for instance, a flood, a hurricane, where there are flooded bridges or flooded roads and you prevent access into an emergency area for a temporary amount of time, even if someone may have a property interest within that flooded or emergency area, here that emergency area being Dare County, under the appellant's argument, preventing temporary access during an admitted emergency would entitle everyone outside of that zone to some form of compensation. That is not a workable standard. If we think about situations such as... Why would that necessarily be, right? Because I think you would agree that it would, at least under the character of a government action, if it applied to residents and non-residents alike, the character of the action looks different as we're allocating the burden of that regulation. So if Dare County says, listen, resident, non-resident, visitor, non-visitor, I don't care, you've got to go because the hurricane is coming, that looks like a very different regulation than, you know, everybody is here, we're going to take care of you, but you outsiders, we want nothing to do with you. It looks a little bit different, but it's also going to the heart of the character of done in the Kelo case, try to eliminate blight or some kind of economic growth, as opposed to here, the exercise of the police power, trying to prevent people from drowning in a flood or prevent people from spreading or obtaining a novel coronavirus disease. The character of the governmental action here was trying to prevent a more dense population within the county at that time. It seems to be undisputed that preventing a non-resident property owner from entering for a temporary amount of time would prevent the density within that population, prevent the potential for others to either receive or spread the virus during this temporary time period. That is a character. Does the record reflect that that was the, that was the reason, because you can imagine two different reasons for saying no to outsiders. One is we don't want density, right, and I understand that argument. But the other is, is like, we want to be isolationist, right? We want to, you know, keep people here because we feel like we've been pretty safe so far and we're reading about people that are not from here who are carrying a lot of this virus around with them. And so we just want to keep people out. I mean, this is purely, it's not about density. It's really about just keeping outsiders away. In this case, the record reflects that it wasn't about the isolationist view. It was about preventing the spread. And what in the record suggests that, suggests that to me? Because the emergency declarations, the DARE County declarations of states of emergency and those enactments on those bulletins would suggest that that was the purpose of the enactment. And going on that, I just don't, I mean, I guess maybe I'm, maybe I didn't read them closely enough. I don't see what about them suggests that the rationale is density as opposed to protectionism. Maybe those aren't like totally different, but they come at the problem in a different way. Correct. But at the core of those two concerns is preventing, preventing the spread of a disease or preventing harm to those within that population, which goes to the core of the character of the governmental action here, which the district court correctly said decisively weighed in DARE County's favor in this instance. If we look at the, so counsel, I know we've gone kind of back and forth on different things with Judge Richardson's very substantial questions, but have you discussed the second factor, the interference with reasonable expectations of investment, or do you think that needs any discussion? Well, I just don't, I didn't want it to be left out. It is our contention that the investment-backed expectations prong, while the district court did state that it was in appellant's favor, it weighs towards DARE County in this instance. If we look at the investment-backed expectations when you own property, the Supreme Court has recognized under the Moogler v. Kansas case that all property in this nation is held under the implied assumption that it is not beyond control in the exercise of the state's police powers. When you purchase property, you do not have the investment-backed expectation of unfettered use of that property. When you purchase a secondary vacation home or you purchase a plot of land, there is no reasonable investment-backed expectation that you would be able to use that property at your whim, particularly during a pandemic or when there's a contagious disease or other type of emergency within that zone. So it would be our contention under that factor that it would also weigh in our favor because all property is taken subject to that expectation that in times of emergency, it may be, the use cannot be unfettered. Is there any evidence in the record of either DARE County or the state of North Carolina having limitations on being on the outer banks during emergencies like hurricanes? I know this is like assuming the world away, right, because we all know that that's true because we see the news, but is there anything in the record that would allow us to say that someone buying property on the outer banks in DARE County would have been aware that there would be times where they've been excluded based on hurricanes or evacuation orders of various types? Well, the court can certainly take judicial notice. There's nothing on the record specifically referencing hurricanes or the like, but the court could certainly take judicial notice of an undisputed fact, which is that in the outer banks, which are way out into the ocean, which are only accessible through bridges, you could take judicial notice of hurricanes such as Hurricane Matthew and other similar hurricanes that have affected these coasts. The judicial notice I'm concerned about there is, were those mandates that were punishable by law? I mean, at least in some instances, evacuation orders are effectively voluntary. Maybe you have to sign something that says, in the case of an emergency, I recognize that law enforcement or medical personnel aren't going to come help me. You sign your own death warrant kind of story, but what I don't know is whether those are mandatory or not, and that's why I was asking for something that was in the record. I would have to look further into that, but I would say that they were mandatory and likely enforced by sheriff or sheriff's deputies, which would close off particular portions of the county area that, let's say, the bridge is out or there's a flooded zone where you cannot access. And under appellant's theory, because you're limited access for a temporary amount of time, regardless of whether you admit there's an emergency in that area, compensation is due. It's just not feasible for a government to have to compensate as a total, taking every block of access into an emergency area. Well, let's just assume, for purposes of argument, that we agreed with the district court on the first two penitential factors. Tell us why the third factor carries so much weight that the district court's decision was correct. Yes. And you're referring to the character of governmental action? Yes, sir. The character of the governmental action is one of the keystones or one of the critical points in the penitential analysis, and it many times outweighs these other considerations that are in effect. Here, we are talking about an unprecedented pandemic that is a once in a lifetime every 100 years faced by the population. That has led to over 1.5 million deaths in the United States so far, if you accord the CDC statistics. So Penn Central noted that a temporary restriction is a quintessential example of a restriction that adjusts the benefits and burdens of economic life to promote the common good or otherwise address a harm to residents cannot be considered a taking. If we look at Keystone, the Tuminous Coal Association, which is a 1987 Supreme Court case, the court also recognized that the character of governmental action factor is very important in the assessment. I realize that I'm out of time. But the court stated... Let them go over a little bit, so we're going to give you a little leeway, too. Thank you, Your Honor. In Keystone, the Supreme Court stated, it leaned heavily against the finding of a taking where the defendant was acting to prohibit what it perceived to be a significant threat to the common welfare. It leaned heavily against the taking. Here, the court is asked to weigh that character of governmental action of an unprecedented pandemic against the minimal intrusion on property rights that the plaintiffs and the plaintiffs here and decide whether a regulatory taking has occurred. Focusing on what was before those elected officials that were put in that position to make these actions, a court, knowing that it cannot supplant or should not substitute those decisions of those elected officials, should view that character of governmental action and place it at the forefront of their decision in deciding that, compared to the case, which is a 45-day travel restriction, was not a taking under Penn Central. And also, of course, not a physical taking, because no one appropriated or entered or was allowed to access the land of the appellant at any time. Is there anything else you wanted to tell us that you would like to tell us very succinctly? That is all, Your Honor. All right. Anything else? All right. Thank you very much, Mr. Smith. You have got some rebuttal time here. Thank you, Your Honor. And I assume I can take off my mask? Yes, sir. Please. Again, my name is Lloyd C. Smith III, and again, I would address, I think, first the issue that was brought forth by Learned Counsel regarding police power. While I am not here to argue that the State does not have some inherent police power to imminent harm or imminent disasters, I think that courts have consistently held that. Looking at Justice Roberts in the most recent Cedar Creek, one of the arguments that I guess the non-prevailing side had made was specifically that under the theory the court was espousing that you were, in essence, getting rid of the idea of nuisance. Counsel, if you will move over just a little to be in front of the mic, that will help the recording. I apologize. Sorry. And again, Justice Roberts addressed that, as the court had previously addressed, and stated specifically that except to the extent that background principles of nuisance and property law independently restrict the owner's intended use of the property, again, and I think this has been brought forth by some of the questioning today, the record before the court here does not contain any historical precedents supporting the actions of police power that were taken by the county in this circumstance. I would submit that all the cases that have been cited by both parties in the briefs in no way address a circumstance like the one we have here. This is, in essence, a novel issue, but if you go back and look, the record certainly does not contain any historical precedents that the government has the police power to basically exclude you from your property, and I understand the court's position in questioning that. Although the Supreme Court has said that they can do that if it's a crime scene or if it was a burnt out building, or I don't remember all the examples they gave, right, but that government's interest is high that they can do some exclusion. Those are all historical examples of that. The question is, is this close enough to the burned out building or a crime scene, neither of which, by the way, the building is already burned out, right, so it doesn't pose an immediate threat of death, right? The crime scene, the crime is over, right, so that's not an immediate threat of death. I mean, so there's something less than that, right? There is, and I would agree. Now, I would submit to you that when you're looking at the scenario, and I believe Justice Robertson mentioned those in the Cedar Point, the idea you're coming under a Fourth Amendment and other constitutional amendments that are coming forth from criminal investigations, and I would agree that they have already occurred. If you look at, I think the more appropriate area to look at would be where they talk about imminent disasters, and I would submit to you Is that where there were government authorized personnel, even though they were private actors who physically came on the property? I believe so, Your Honor. It was the case in California. Right, right. Well, we don't have that here. We don't have the fact that the government, in essence, allowed private individuals to come on the property. I would agree with that. However, I think that the proposition that those cases stand for, that the government, and I believe the language used was the government cannot oust you from your property. The facts here are that the government, in essence, stood in the shoes, that very right of exclusion that's so important, that the courts have constantly harped on, this important right of exclusion you have to your property, and that's a basic right that's been established, in essence, what's occurred here is the county has stepped into those shoes of the Blackburns and used that same power to exclude them from their property. They have taken that very property right that's deemed so important in all prior jurisprudence and taken it for themselves and used it against the property owner. Does it matter to your analysis that the property effect here is incidental? Nothing about the ordinance itself turns on being a property owner or not a property owner or what piece of property you have. It's a ban on travel, and it turns on you being a resident or not, whether you can come in a resident of certain counties, and it's true they distinguish between non-resident property owners and non-resident visitors, but they do that to the benefit of the property owners, right? They're just trying to give them more time to come in and out of the county, but it seems like the travel restriction here is only an incidental effect on property, and I'm missing that? I certainly understand what you're saying, Your Honor, and I respectfully would disagree with that. Help me understand why you disagree. The reason I would disagree with that is that I believe that the actions that were taken, and again, this probably goes along with the Penn Central test, which I will be the first to submit. It's complicated, at least in my mind, and the third prong, if you look at the character and nature of what was done, I would surmise that when you ban someone with sheriff deputies at a bridge, this isn't a voluntary evacuation, this isn't a civil penalty, there was a criminal penalty attached to this. You would be charged with misdemeanor for coming in, so you're charged with a criminal penalty. Taking away what I would submit to you is a right to go on your property. That is a fundamental right. If you look at all the cases we've cited, even the ones where the courts and the Supreme Court have found that there was no taking, there was never a case where they were not allowed to actually physically go on their property. Now, they might not have been able to use it for a certain thing, but they could go on their property. So I would submit to you, Your Honor, that the difference is, I think in the way we're describing it, is I don't find that to be an incidental thing, I guess, for lack of a better term, that what they did, while yes, it could be perceived as a travel ban, that travel ban's nature so affected the property rights of the non-resident property owners that it was not an incidental thing, and it becomes a regulatory action taken against property, which we would claim is a physical taking or further under Penn Central, and I think I'm at one second now, a taking. And I think that would be the difference there. So I'm not aware of there being any cases cited by counsel on either side of whether or not in the prior pandemic, in the 1920 timeframe, whether there were ever any cases because that approved of a takings recovery, because there were certainly lots of barriers to travel, entry, and departure that were enacted across the country back at that time. Are you aware of any case that found a taking back then? Your Honor, I'm not aware of any case that would be directly on point to the factual situations presented to us here. I mean, certainly there have been quarantine cases, there have been issues. I know counsel for the county submitted some older cases dealing with even one that happened during the Cuban-American War. Again, I'm not aware of anything that's directly on point where they have exercised this degree of control over the real property of a homeowner. And so that would be my answer there, Your Honor.  Counsel, we appreciate your arguments. We appreciate the argument of both counsel and sort of COVID-related, we're not permitted to come down and shake hands with you as we would normally do. So we hope you'll come back in the future when we're able to do that. Not related to this case, but either of the Mr. Smiths, could you inform the panelists what you think the fishing is going to be like next month down in that area? I consider myself an expert on that and nothing else. Are you going to be surf fishing or boat fishing? Depends on what I can do. The white marlin fishing will be extraordinary heading north out of Oregon Inlet. The sea mullet fishing will be extraordinary out of the surf. The drum fishing will be fabulous at dark. And I have eight 14-foot hat receivers if you need to borrow them. I don't think he'll do that. Don't be worried about that. That's not undue influence, but greatly appreciated. Trout fishing is really good right now. How long will that last? Who knows? All right, we thank you very much. And I'll ask the clerk to adjourn us for the day.
judges: G. Steven Agee, Julius N. Richardson, Allison J. Rushing